Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| ÁNGEL L. CARDONA MELÉNDEZ Y/O NEMENSIA DÍAZ GARAY<br><br>Recurridos<br><br>v.<br><br>MÁXIMO SOLAR INDUSTRIES, INC., SERVICE FINANCE COMPANY LLC<br><br>Recurrente | KLRA202300217 | *REVISIÓN ADMINISTRATIVA* procedente del Departamento de Asuntos del Consumidor<br><br>Querella número: SAN-2018-0002295<br><br>Sobre: Ley Núm. 5 |

Panel integrado por su presidenta, la juez Domínguez Irizarry, la juez Rivera Marchand y la juez Aldebol Mora.

Aldebol Mora, Juez Ponente

# SENTENCIA

En San Juan, Puerto Rico, a 27 de noviembre de 2023.

Comparece ante nos la parte recurrente, Máximo Solar Industries, Inc., mediante *Recurso de Revisión Judicial* y solicita que revoquemos la determinación emitida por el Departamento de Asuntos del Consumidor (DACO) el 27 de marzo de 2023, notificada al día siguiente. Mediante el referido dictamen, la agencia declaró con lugar la querella de epígrafe incoada por la parte recurrida, Ángel L. Cardona Meléndez y Nemensia Díaz Garay.

Por los fundamentos que expondremos a continuación, se confirma la determinación administrativa recurrida.

## I

El 15 de mayo de 2018, Ángel L. Cardona Meléndez (Cardona Meléndez) y Nemensia Díaz Garay (Díaz Garay) (recurridos) radicaron una querella ante el DACO, posteriormente enmendada,[1] en contra de Máximo Solar Industries, Inc. (Máximo Solar o recurrente) y Service Finance

---

[1] Véase, *Moción Asumiendo Representación Legal y Querella Enmendada* en el expediente administrativo.

Company, LLC (Service Finance).[2] En síntesis, indicaron que contrataron los servicios de Máximo Solar para la instalación de placas solares (sistema fotovoltaico) en su residencia. Alegaron que el representante de ventas del recurrente afirmó que iban a tener funcionando los aires acondicionados, la lavadora, la secadora, el calentador, los televisores y la estufa eléctrica de su residencia. Arguyeron que dicho representante les informó que no pagarían las mensualidades de la compañía financiera Service Finance por el término de un (1) año. Señalaron que dicha persona les indicó que el sistema iba a producir –al igual que suministrar– energía a la Autoridad de Energía Eléctrica (AEE) y que recibirían un cheque a esos efectos. Según adujeron, aunque acordaron la instalación de trece (13) placas solares, Máximo Solar instaló doce (12) y cuatro (4) baterías en la residencia, pero el sistema de tuberías fue ubicado encima del techo de la propiedad.

Los recurridos plantearon en su querella que, el 20 de septiembre de 2017, el sistema fotovoltaico instalado dejó de funcionar, por lo que realizaron varias reclamaciones a Máximo Solar. Alegaron que, en distintos días, Máximo Solar envió a sus empleados a la residencia e instalaron tres (3) placas solares adicionales y reemplazaron las cuatro (4) baterías por unas nuevas. Arguyeron que, posteriormente, se percataron que ciertos equipos de su hogar –como la lavadora– no funcionaban, por lo que procedieron a comunicarse con Máximo Solar. Según adujeron, el recurrente envió un técnico a la residencia, quien les indicó que era necesario comprar cuatro (4) baterías adicionales y un gabinete de la compañía para protegerlas; les explicó que, para que el sistema funcionara en su totalidad, debían encender el interruptor de la AEE, lo cual ocasionaría que recibieran dos (2) facturas de dicha agencia. Sostuvieron

---

[2] Anejo I del recurso, págs. 26-29. Cabe destacar que, el 26 de enero de 2023, mediante escrito intitulado *Moción Conjunta sobre Aviso de Desistimiento con Perjuicio de la Querella en Contra de la Querellada Service Finance Company, LLC.*, los recurridos y Service Finance informaron que habían llegado a un acuerdo transaccional. Indicaron que, como parte de la referida transacción, la parte recurrida desistía con perjuicio de la totalidad de la querella de epígrafe en contra de Service Finance. En vista de ello, el 31 de enero de 2023, el DACO emitió una *Resolución Parcial* mediante la cual ordenó el cierre y archivo de la querella en contra de Service Finance por desistimiento con perjuicio. Véase, Anejo II del recurso, págs. 30-34.

que nunca fueron orientadas de lo anterior, previo a la instalación inicial del sistema.

Por otro lado, los recurridos argumentaron que se vieron obligados a pagar la suma de $290.00 a Service Finance por atrasos en las mensualidades del financiamiento y que esta le estaba cobrando $330.33 adicionales. Sobre ese particular, plantearon que la oferta del año gratuito ofrecida por Máximo Solar no era cierta, que las facturas se las enviaron a una dirección errónea y que recibieron un documento con una firma que no era la de Cardona Meléndez.

En general, los recurridos plantearon que el sistema fotovoltaico no cumplía con sus expectativas y no funcionaba a cabalidad. Alegaron que fueron engañados en la presentación del producto y el sistema, que no fueron orientados debidamente y que Máximo Solar incumplió con el contrato. En virtud de lo anterior, solicitaron la cancelación del contrato, la liberación de penalidad y de cobro adicional, así como la remoción de las placas solares instaladas, las baterías y sus componentes.

En respuesta, Máximo Solar acreditó su contestación a la querella.[3] En esencia, negó las alegaciones en su contra. Aceptó la instalación de placas solares adicionales y el reemplazo de baterías como resultado de un acuerdo con el fin de transar cualquier controversia y dar por terminado el asunto.

Luego de varios trámites procesales, culminado el descubrimiento de prueba y celebrada una vista administrativa a esos efectos, el 27 de marzo de 2023, notificada al día siguiente, el DACO emitió la *Resolución* que nos ocupa, mediante la cual declaró con lugar la acción de epígrafe.[4] En esta, consignó las siguientes determinaciones de hechos:

1. Alega la parte querellante que contrató los servicios de la firma querellada para la instalación de placas solares en su residencia debido a que constantemente tenía interrupciones del servicio de electricidad debido a las ramas de un árbol de flamboyán ubicado al otro lado de la calle que interfería con el tendido eléctrico de la AEE.

---

[3] Véase, *Contestación de Querella Enmendada* en el expediente administrativo.
[4] Anejo V del recurso, págs. 58-81.

2. Que, para restaurar la electricidad al área, usualmente es necesario que una brigada de la AEE suba al cableado tumbado por el árbol que caus[ó] corto circuito[.]

3. Que toma entre 2 y 3 días en llegar las brigadas de la AEE y[,] mientras, los querellantes se mantienen sin electricidad.

4. Que los querellantes no estaban de acuerdo entre sí, si deseaban resolver la situación creada por los apagones constantes comprando una planta o un sistema de placas solares.

5. Que la querellante doña Nemensia Díaz Garay escuchó por radio un anuncio de la parte querellada Máximo Solar Industries, Inc. y los llamó.

6. Que un vendedor, llamado Freddie Negrón, quien para aquel entonces trabajaba para la parte querellada los visitó en su hogar el 2 de mayo de 2017.

7. Que la querellante declaró que el vendedor que los visitó fue un martes[.]

8. Que los querellantes y el vendedor se reunieron por unas dos a dos horas y media en la terraza del hogar.

9. Que la querellante le explicó la situación con el árbol de flamboyán y el poste, y llevó al vendedor hasta el poste para verlo.

10. Que la querellante le explicó al vendedor que ella pagaba poco por la luz[,] pero que el motivo de tener un sistema era para atender las interrupciones en el servicio de luz.

11. Que la querellante testificó que[,] antes de poner el sistema de placas, ella pagaba alrededor de $67.00 mensuales en electricidad.

12. Que la querellante testificó que el motivo para comprar el sistema de placas no era para ahorrar dinero sino [para] asegurar [la] continuidad en el servicio de energía eléctrica.

13. Que la querellante le enseñó la factura de luz al vendedor y [e]ste le dijo que el sistema que le iba a vender le iba a "correr la casa completa".

14. Que la carga eléctrica en la casa consiste de los siguientes enseres: un horno de microondas, una nevera, dos televisores, una lavadora y un calentador de agua de "pipote".

15. La querellante declaró que el vendedor le dijo que "todo, que todo" le "iba a funcionar" a la misma vez.

16. Que los querellantes le preguntaron si el sistema que le iban a vender correría también un aire acondicionado y una secadora, a lo que el vendedor les confirmó que sí.

17. Que los querellantes confiaron en las expresiones del vendedor a los efectos de que el sistema de placas sugerido podría[,] no solamente correr la carga eléctrica de la casa actual, sino que podrían añadir un aire acondicionado y una secadora eléctrica en el futuro.

18. Que el vendedor les hizo un dibujo durante la reunión[,] pero que este dibujo no fue producido por la parte querellada junto con otra prueba requerida por los representantes de los querellantes.

19. Que el vendedor gestionó el financiamiento usando una aplicación en un teléfono inteligente o tableta que tenía al momento de la visita al hogar de los querellantes.

20. El querellante, [Á]ngel Cardona Meléndez, declaró que[,] según su recuerdo[,] vio al vendedor más que el día de la reunión en la terraza.

21. Recuerda el querellante haber firmado un documento, que el vendedor tomó una fotografía de su licencia de conducir y de la tarjeta de crédito de la querellante.

22. La querellante recuerda que el vendedor llenó unos campos para solicitar el financiamiento para el sistema a través de un tercero.

23. La querellante, Nemensia Díaz Garay, declaró que[,] según su recuerdo[,] vio al vendedor más que el día de la reunión en la terraza.

24. El vendedor declaró que visitó a los querellantes en una segunda ocasión para obtener un referido de una amistad de los querellantes.

25. Que el día de la reunión el querellante recuerda que estampó su firma en un solo documento.

26. Que el querellante no recuerda haber hecho firma en una tableta, computadora o teléfono celular.

27. A los querellantes nunca le[s] entregaron copia de los términos y condiciones del financiamiento antes ni después de firmar el contrato de venta con el querellado.

28. Lo único que sabían los querellantes sobre los términos y condiciones del financiamiento fue lo que les comunicó el vendedor del querellado.

29. El vendedor les dijo que la tasa era "bajit[a], pero bien bajit[a]" y que la cantidad a financiarse era aproximadamente $16,000.00. Les informó que no tendrían que hacer pagos por un año, que [e]l primer año era gratis y que todos los meses recibirían un "chequecito" de la AEE por la energía que el sistema produjera en exceso.

30. El vendedor declaró que, en el momento de hacer el contrato, no se les dejó copia del contrato con los querellantes compradores porque estos documentos se les envía por email al cliente o se recogen en la tienda de Máximo Solar [en] la Roosevelt donde se imprimen.

31. El vendedor declaró que la razón por la cual no se entregan el contrato *[sic]* y los documentos requeridos para el financiamiento se debe a que [las] copias son enviadas "automáticamente" a la dirección de correo electrónico del cliente.

32. La parte querellada no produjo copia de las comunicaciones electrónicas entre ella y los querellantes, no empec[e] haber sido requeridos por las partes querellantes a producir todas estas comunicaciones.

33. Que los querellantes declararon que el vendedor había entrado a la casa.

34. Que el vendedor les dijo a los querellantes que las baterías se pondrían en una cajita pequeña.

35. Declaró la querellante que el vendedor les había dicho que la caja de control del sistema se iba [a] instalar dentro de la casa[,] al lado de la caja de los "breakers" en la sala.

36. El día de la reunión, el vendedor le había mostrado una foto de la caja de control y le dijo que esto se colocaba al lado de la caja de "breakers".

37. Sin embargo, cuando el equipo llegó a la residencia de los querellantes para hacerse la instalación acordada, la ubicación de las cajas y baterías cambió.

38. Los miembros del equipo de instalación dijeron a los querellantes que las baterías y equipos no se podrían instalar en la sala porque no cabía en ella. No se podía instalar en el balcón porque habría que romper concreto para bajar la cablería, por lo que decidieron los trabajadores que las baterías y equipos se instalaron en la terraza y los tubos con la cablería bajaron del techo por un espacio entre unas planchas de zinc que tuvieron que levantar y sellar *[sic]*.

39. Que luego de instalada[s] las placas, equipos y baterías, nadie de la empresa querellada les explicó c[ó]mo verificar los equipos en caso de una avería ni c[ó]mo dar mantenimiento al sistema.

40. Que la parte querellante le requirió a la parte querellada copia de todo documento relacionado con el caso de epígrafe y la parte querellada no entregó los documentos solicitados.

41. La parte querellada no produjo copia de las comunicaciones electrónicas entre ella y los querellantes, no empec[e] haber sido requeridos por las partes querellantes a producir todas estas comunicaciones.

42. El sistema quedó destruido por el Huracán María. Los vientos levantaron el zinc por donde bajaban los tubos con cablería y se llevaron las demás planchas.

43. Que los querellantes intentaron llamar a la empresa querellada en varias ocasiones después del Huracán María sin éxito. Que los querellantes tuvieron que llegar a un local de Máximo Solar [en] la Roosevelt para hacer su reclamación pasado unos meses.

44. El vendedor, Freddie Negrón, declaró que la pareja llegó a visitarlos a los tres o cuatro días después del paso del [H]uracán María.

45. El vendedor declaró que si la querellante testificó que ella había llegado mucho después de María porque primero se cansó tratando de llamarlos sin éxito, no era lo que ocurrió.

46. Que aun luego de que los querellantes se presentaran en el local del querellado, no fueron atendidos sus reclamos.

47. Que la querellante tuvo que contratar a un abogado para que la acompañara al local y reclamar la falta de servicio.

48. Que no es hasta que contrata el abogado que se da cuenta que nunca había recibido copia del acuerdo, del contrato completo ni los documentos sobre el financiamiento del sistema adquirido.

49. Es a través de las gestiones del abogado que pudieron lograr que Máximo Solar acudiera y arreglara el sistema de placas.

50. Que llamó a la querellada para pedir copia del contrato y como estaba por vencer el tiempo de gracia bajo la oferta de financiamiento que se le había prometido, y, no había recibido factura o libreta de pagos de la financiera, pidió a Máximo Solar el nombre de la compañía y teléfono.

51. Cuando llama por primera vez a la financiera, se percata que no existía la oferta prometida por el vendedor, que por creer en la misma no pag[ó] y la cuenta qued[ó] en mora.

52. Se enteró así que la dirección postal que tenía la financiera provista por el vendedor de [M]áximo era la residencial y no el apartado postal.

53. Que en el acuerdo aparecen sus direcciones residencial y postal y no se lo proveyeron a la entidad financiera.

54. La dirección postal de los querellantes es HC-01 Box 25080 Caguas[,] PR 00725.

55. Que ambos testigos de Máximo Solar no pudieron precisar cuándo fue que los querellantes hicieron su reclamación para servicio en la Ave. Roosevelt, pero entienden que fue inmediatamente después de la tormenta porque había escasez de combustible para poder moverse.

56. La parte querellada no produjo documento alguno para sustentar que la reclamación se hizo en las primeras semanas después del paso de la tormenta.

57. El técnico de la parte querellante, Daniel Nieves, declaró que el motivo por [el] cual parte de la casa no tenía servicio de electricidad cuando sirve la energía exclusivamente del sistema solar, se debe a algún corte o empate que se hizo antes de la instalación.

58. El técnico no aclaró si al culminar la instalación inicial del sistema de placas, si los instaladores verificaron la situación para suplir luz a toda la casa.

59. El técnico declaró que[,] al verificar si la instalación está funcionando debidamente, su práctica es apagar la luz de la calle y dejar el sistema corriendo únicamente con las placas.

60. No hay prueba ofrecida por el querellado que estas pruebas se hicieron al finalizar la instalación en el hogar de los querellantes, no empec[e] haber sido requerido por la parte querellante producir prueba sobre este particular.

61. La querellante testificó que[,] luego de completar la instalación, los instaladores le explicaron a ella que hasta que la AEE no reconociera la conexión del sistema de placas con el sistema de la AEE, no podrían usar el sistema de placas porque no estaba autorizado y podría conllevar una multa de $5,000.00.

62. La querellante testificó que Máximo no les dio ningún entrenamiento en cómo usar el sistema, ni le entregaron manuales explicativos de uso y mantenimiento.

63. La querellante declaró que[,] después de María, han tenido que llamar a Máximo Solar en varias ocasiones cuando el sistema dejó de funcionar. Cada visita de revisión tiene un costo de $75.00.

64. La querellante testificó que siempre llegan los de servicio después de que regresa la electricidad.

65. Que después de que se dañaron tanto el calentador como el microondas, ante su reclamo por esto, un técnico de la parte querellada les explicó que el sistema no tiene capacidad para estos equipos, que le hacen falta más baterías y placas.

66. Ambos querellantes declararon en su testimonio que tuvieron que reemplazar el calentador y el microondas debido a las fallas del sistema. El costo de remplazo sin instalación del calentador fue de $175.00. El costo de la microondas fue de $600.00.

67. Que la querellante declaró que[,] además[,] han incurrido en los siguientes gastos para hacer valer su reclamo: (1) $12,000.00 en honorarios de abogados; (2) unos $5,000.00 a la financiera; (3) gastos de reembolso de las visitas de servicio y los peritos electricistas que ha tenido que contratar.

68. La querellante declaró que ella y su esposo han sufrido daños emocionales por esta situación.

69. La querellante declaró que ella y su esposo han tenido peleas constantes provocadas por las situaciones e insuficiencias del sistema de placas adquirido.

70. El esposo de la querellante nunca estuvo de acuerdo con comprar las placas y que quería comprar un generador.

71. Que la querellante preguntó al vendedor sobre el acuerdo para el sistema de la reparación, modificación o reemplazo del sistema de energía vendido y todo concerniente a las garantías.

72. Alegó que el vendedor le informó que no iba a tener que pagar las mensualidades de Service Finance Company LLC., por el término de un (1) año; que empleados de la AEE tenían que efectuar un trabajo en el contador de la residencia, ya que el sistema iba a producir y suministrarle energía a la Autoridad y por esto iba a recibir un cheque.

73. Alega que la firma querellada procedió a instalar el sistema dos meses después. Inicialmente, la firma querellada iba a instalar trece (13) placas solares.

74. La querellante [i]ndica que únicamente, le instalaron doce (12) placas solares y cuatro baterías. Procedieron a reubicar la instalación del sistema de tuberías y baterías. Pero, las tuberías fueron instaladas por encima del techo residencial.

75. Informa que, desde el 20 de septiembre de 2017, el Sistema Fotovoltaico instalado dejó de funcionar.

76. Alega que las reclamaciones fueron constantes mediante vía telefónica y se personó a la oficina para solicitar los servicios de reparación de energía renovable.

77. En distintos días, la firma querellada envió su personal a la residencia. Le instalaron tres (3) placas/paneles solares adicionales y reemplazaron las cuatro (4) baterías con baterías nuevas.

78. El último servicio fue el 20 de marzo de 2018.

79. Alega que días más tarde, se percató que ciertos quipos no funcionaban, como la lavadora que estaba marcando bajo voltaje. Procedió a llamar a la firma querellada quien envió a un empleado para verificar el panel de voltaje.

80. La querellante alega que el técnico le indicó que era necesario comprar cuatro baterías adicionales y comprar un gabinete de la compañía para proteger las nuevas baterías. Y que para que el sistema funcionara en su totalidad debía prender el "[s]witch" de la Autoridad de Energía Eléctrica.

81. La parte querellante indica que nunca fue orientada con relación a la compra de otros componentes adicionales y prender el "switch" de la AEE.

82. La querellante alega haberse comunicado con la co querellada Máximo Solar para solicitar el nombre de [la] [c]ompañía [f]inanciera. La financiera co querellada fue la que le informó

que no había emitido los pagos y se reflejaban atrasos. Por tal razón, se vio en la obligación de pagar la cantidad de $290.00 a Service Finance Company LLC., debido a que el año gratuito prometido por Máximo no era cierto.

83. La querellante alega que la firma financiera le envió las facturas a la dirección errónea a pesar de haber informado la dirección postal correcta al vendedor de Máximo Solar.

84. Recibió posteriormente un documento con una firma que no corresponde a su esposo querellante.

85. La parte querellante plantea que el Sistema Fotovoltaico no cumple con las expectativas y promesas de Máximo. No funciona a cabalidad. Se sienten que fueron engañados en la presentación del producto y/o sistema. No fueron orientados debidamente. Además, indica que la firma querellada ha incumplido con el contrato.

86. Alega la parte querellante que falsificaron las firmas en el contrato.

87. Como remedio, la parte querellante solicita la cancelación del contrato, liberación de penalidad, y de cobro adicional y que la firma querellada proceda a recoger las placas solares, baterías y sus componentes y/o lo que en derecho proceda. De igual modo[,] solicita la compensación por daños, perjuicios y angustias mentales.

88. La parte co querellante[,] Ángel Cardona, indicó que al presente el sistema fotovoltaico está funcionando.

89. De igual modo, indica la parte co querellante, Nemensia Díaz Garay, que, al día de hoy, el sistema fotovoltaico está funcionando.

90. Presentado el testigo de la parte co querellada Máximo Solar Industries Inc., Freddy Negrón, [e]ste indicó que su intervención fue una de venta.

91. Indica el testigo Freddy Negrón que trabajó 8 años con la parte querellada como consultor de energía renovable. Sin embargo, en el contrainterrogatorio, admitió que solo trabajó con el querellado por 6 años y que tiene 7 años y medio de experiencia en la industria trabajando con la querellada y otras dos compañías.

92. Declaró a preguntas si había participado en procesos administrativos o judiciales relacionados con equipos que había vendido contestó primero que sí, pero luego indicó que se refería a una participación anterior en este mismo caso.

93. El vendedor insiste en que nunca entró a la casa de los querellantes y que siempre se mantuvo fuera de la casa.

94. El vendedor dijo que el sistema que vendió a los querellantes iba a correr toda la casa de ellos y que iba a correr un aire acondicionado y una secadora también.

95. Según el vendedor, un sistema de 3,120 watts de capacidad como la que adquirieron los querellantes, es suficiente para correr la casa de los querellantes.

96. El vendedor asever[ó] que, si los querellantes escucharon que todos los meses iban a recibir de la AEE un chequecito por la medición neta, escucharon mal.

97. El vendedor dijo que es falso el que la Sra. Díaz lo escuchara decir que iban a recibir un crédito en su factura de luz o que dijo que iban a recibir un chequecito.

98. El testigo admitió que no le entregó la información sobre el financiamiento a los querellantes en un papel.

99. Aunque el vendedor declaró que los dos Exhibits presentados de los acuerdos eran idénticos, luego de tener una oportunidad para examinarlos, se dio cuenta que no eran idénticos, porque el Exhibit 1 no especifica el modelo del inversor, las baterías son las mismas, diferencian en el número de paneles, uno está escrito a mano y el otro en computadora, la capacidad del sistema indicado en cada uno es distinto.

100. Indic[ó] que en la única vez que visitó la casa de los querellantes [é]l "les educó" sobre la energía renovable.

101. Que esa "educación" consistía en explicarles lo que era la energía solar, cuáles son sus beneficios, que él les dijo a ellos

que íbamos [a] hacer una medición neta, que su factura iba a bajar y que iban a tener un ahorro y que cu[a]ndo hubiera una ausencia de energía, un apagón de luz, su sistema solar iba a coger las cargas -luego se corrige el testigo y dijo "las cargas de emergencia".

102. Según el testimonio del vendedor para tramitar el financiamiento de los equipos, la parte querellante tenía que dar información, incluyendo direcciones de correo postal, dirección física y correo electrónico[.]

103. Según el vendedor, sin un correo electrónico del solicitante la financiera no le iba a autorizar el financiamiento.

104. Indic[ó] que, sin la firma digital del solicitante, la financiera no puede aprobar el préstamo. Que, por esto, la parte querellante tenía que haber firmado en su tableta la solicitud de préstamo.

105. Sin embargo, en el contrato de Máximo Solar, no existen emails. A preguntas sobre c[ó]mo lleg[ó] el email a la financiera si no aparecía en la orden declaró que "en Service Finance entiendo que tenía que poner un email y el cliente tuvo que haber dado uno".

106. Si los contratantes no tenían un email, él hubiese tenido que irse del lugar porque "puede haber aprobación, pero si no firma el acuerdo, no prestan el préstamo -el dinero".

107. Declaró el vendedor que él fue la persona que llenó la solicitud de financiamiento con Service Finance Company, LLC, incluyendo las direcciones postales y residenciales de los querellantes.

108. El vendedor declaró que él puso la dirección que le dijo el cliente, por lo que, si había un error en la dirección postal que tenía Service Finance Company, LLC para los querellantes, se debía a que [e]stos le habían dado la dirección incorrecta. [É]l no cometió error. Sin embargo, el vendedor puso la dirección postal correcta en el "acuerdo" que llenó para su patrono, Máximo Solar.

109. Indica Freddie Negrón que cualquier asunto con el financiamiento o cualquier pregunta y orientación tenía que ser realizada directamente con la coquerellada Service Finance Company, LLC, que era la compañía que financiaría.

110. En cuanto a lo alegado sobre el contrato y la alegada falsificación de firma, de los exhibits presentados se evidencia que existían dos tipos [de] contratos[,] pero que s[o]lo uno tenía la firma de ambos, tanto de la parte querellante como el testigo Freddie Negrón.

111. El otro exhibit sobre el contrato con la alegada falsificación de firma no se podía evidenciar de quién era. Freddie Negrón indicó que ese documento nunca lo había visto y no contenía su firma.

112. Daniel Nieves, testigo de la parte coquerellada Máximo Solar Industries, Inc., indicó que en todas las ocasiones que la parte querellante le solicitó asistencia fue personalmente a realizar la asistencia pertinente.

113. Testificó, Daniel Nieves, que ayudó a los querellantes orientándoles de cómo utilizar el sistema fotovoltaico, debido a que la querellante Nemensia Díaz Garay bajaba el "switch["] que da carga a la casa. Que este acto por desconocimiento produjo que sus equipos entraran en un sobre voltaje, dañándolos.

114. Daniel Nieves indicó que la sección de la casa que no se electrificaba al encender el equipo no se podía energizar por el sistema fotovoltaico debido a que tenía una cablería eléctrica separada de las otras secciones de la casa desde antes de que se instalara el sistema fotovoltaico.

115. Indica Daniel Nieves que esto se lo había indicado a los querellantes, que era necesario reparar o resolver el asunto.[5]

---

[5] Véase, Anejo V del recurso, págs. 59-69.

El organismo administrativo hizo constar en la determinación recurrida que Máximo Solar rehusó producir los documentos responsivos relevantes a la compraventa del sistema fotovoltaico a plazos por los recurridos, por lo que le aplicaban las presunciones adversas permitidas por las Reglas de Evidencia de Puerto Rico, 32 LPRA Ap. VI.

Aquilatada la prueba desfilada durante la vista administrativa, la agencia recurrida determinó que se probó que el consentimiento prestado por los recurridos adolecía de vicios causados por las representaciones falsas y engañosas realizadas por Máximo Solar. Afirmó haberle dado entera credibilidad al testimonio de la parte recurrida.

Basado en lo anterior, el DACO concluyó que Máximo Solar incurrió en actos prohibidos por el Reglamento Contra Prácticas y Anuncios Engañosos, Reglamento Núm. 8599 de 28 de mayo de 2015 (Reglamento Núm. 8599), por lo cual declaró con lugar la querella de epígrafe. En su consecuencia, determinó que el contrato en cuestión era nulo por dolo en la contratación y ordenó a Máximo Solar a resarcir a los recurridos la cantidad de $5,000.00 por concepto de las mensualidades pagadas por los equipos comprados. Además, ordenó al recurrente a indemnizar a la parte recurrida con la suma de $25,000.00 a cada uno por los daños, perjuicios, angustias mentales y daños emocionales causados. A su vez, impuso el pago de $15,000.00 por concepto de honorarios de abogado de los recurridos, ello, por entender que Máximo Solar fue temerario en el trámite de la querella.

En desacuerdo, el 15 de abril de 2023, la parte recurrente presentó una *Reconsideración*,[6] la cual no fue considerada por el DACO dentro del término estatuido para ello.

Inconforme con la determinación de la agencia, el 15 de mayo de 2023, la parte recurrente compareció ante nos e hizo los siguientes señalamientos:

---

[6] Anejo VI del recurso, págs. 82-99.

Erró el Honorable Departamento de Asuntos al Consumidor al declarar con lugar la querella presentada y declarar nulo el contrato entre las partes por dolo.

Err[ó] el Honorable Departamento de Asuntos al Consumidor al declarar con lugar la querellada *[sic]* bajo actos prohibidos en el Reglamento de Anuncios Engañosos.

Erró el Honorable Departamento de Asuntos al Consumidor a conceder indemnizaci[ó]n de daños por angustias mentales por $25,000.00 a cada querellado[.]

Erró el Honorable Departamento de Asuntos al Consumidor al ordenar a resarcir a los querellantes cinco mil dólares ($5,000.00) por concepto de mensualidades pagadas por equipos comprados[.]

Erró el Honorable Departamento de Asuntos al Consumi[dor] al declarar con lugar la imposici[ó]n de honorarios de abogados por $15,000.00[.]

En cumplimiento con nuestras *Resoluciones* emitidas el 23 de mayo de 2023 y el 1 de agosto del mismo año, la parte recurrida compareció mediante *Alegato en Oposición* el 7 de agosto de 2023.

Con el beneficio de la comparecencia de las partes, así como con la copia certificada del expediente administrativo, nos disponemos a resolver el recurso que nos ocupa.

## II

## A

Los tribunales apelativos debemos otorgar amplia deferencia a las decisiones emitidas por las agencias administrativas, puesto que estas cuentan con vasta experiencia y pericia para atender aquellos asuntos que se les han sido delegados por la Asamblea Legislativa. *Hernández Feliciano v. Mun. Quebradillas*, 2023 TSPR 6, 211 DPR ___ (2023); *OEG v. Martínez Giraud*, 210 DPR 79 (2022); *Super Asphalt v. AFI y otro*, 206 DPR 803, 819 (2021); *Graciani Rodríguez v. Garaje Isla Verde*, 202 DPR 117, 126 (2019); *Rolón Martínez v. Supte. Policía*, 201 DPR 26, 35 (2018). Es por ello, que, tales determinaciones suponen una presunción de legalidad y corrección que a los tribunales nos corresponde respetar, mientras la parte que las impugne no presente prueba suficiente para derrotarlas. *Íd.*; *Batista, Nobbe v. Jta. Directores*, 185 DPR 206, 216 (2012). No obstante, tal norma no es absoluta. Es por ello que nuestro Máximo

Foro ha enfatizado que no podemos imprimirle un sello de corrección, so pretexto de deferencia a las determinaciones administrativas que sean irrazonables, ilegales o contrarias a derecho.

En *Torres Rivera v. Policía de PR*, 196 DPR 606, 628 (2016), nuestro Tribunal Supremo resumió las normas básicas en torno al alcance de la revisión judicial de la siguiente forma:

> [L]os tribunales deben deferencia a las decisiones de una agencia administrativa, pero ésta cederá cuando: (1) la determinación administrativa no está basada en evidencia sustancial; (2) el ente administrativo erró en la aplicación o interpretación de las leyes o reglamentos que se le ha encomendado administrar; (3) el organismo administrativo actuó arbitraria, irrazonable o ilegalmente, realizando determinaciones carentes de una base racional, o (4) la actuación administrativa lesionó derechos constitucionales fundamentales. Es importante destacar que si el tribunal no se encuentra frente a alguna de esas situaciones, aunque exista más de una interpretación razonable de los hechos, procede que se valide la interpretación que realizó la agencia administrativa recurrida. *Íd.* Véase, además, *Super Asphalt v. AFI y otro*, supra, pág. 819.

El criterio rector bajo el cual los tribunales deben revisar las decisiones administrativas es el criterio de razonabilidad. *OEG v. Martínez Giraud*, supra; *Super Asphalt v. AFI y otro*, supra, pág. 820; *Graciani Rodríguez v. Garaje Isla Verde*, supra, pág. 127; *Torres Rivera v. Policía de PR*, supra, pág. 626. Bajo este criterio, se limita la revisión judicial a dirimir si la agencia actuó de forma arbitraria o ilegal, o de manera tan irrazonable que su actuación constituya un abuso de discreción. *Íd.*

Bajo este supuesto, la Sección 4.5 de la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, Ley Núm. 38-2017, 3 LPRA sec. 9675 (LPAU), "estableció el marco de revisión judicial de las determinaciones de las agencias administrativas". *Rolón Martínez v. Supte. Policía*, supra, pág. 35. La intervención del tribunal se limita a tres áreas, a saber: (1) si el remedio concedido por la agencia fue apropiado; (2) si las determinaciones de hecho que realizó la agencia están sostenidas por evidencia sustancial que obra en el expediente administrativo visto en su totalidad, y (3) si las conclusiones de derecho del ente administrativo fueron correctas. *Íd.,* págs. 35-36; *OEG v. Martínez Giraud*, supra; *Torres Rivera*

*v. Policía de PR*, supra, págs. 626-627; *Batista, Nobbe v. Jta. Directores*, supra, pág. 217. Nuestro Máximo Foro ha expresado que esta intervención "debe ocurrir cuando la decisión administrativa no se fundamente en evidencia sustancial o cuando la agencia se equivoque en la aplicación de la ley". *Rolón Martínez v. Supte. Policía*, supra, pág. 36. Siendo así, aquellas determinaciones de hechos formuladas por el ente administrativo deberán sostenerse cuando estén basadas en evidencia sustancial que surja del expediente administrativo considerado en su totalidad. *Íd.; OEG v. Martínez Giraud,* supra; *Super Asphalt v. AFI y otro,* supra.

Por otro lado, las determinaciones de derecho pueden ser revisadas en su totalidad. Sec. 4.5 de la LPAU, 3 LPRA sec. 9675; *Rolón Martínez v. Supte. Policía*, supra, pág. 36; *Torres Rivera v. Policía de PR*, supra, pág. 627. No obstante, los tribunales deberán darles peso y deferencia a las interpretaciones que la agencia realice de aquellas leyes particulares que administra. *Íd.*

El Tribunal Supremo de Puerto Rico ha dispuesto que la deferencia que le deben los tribunales a la interpretación que haga el ente administrativo sobre aquellas leyes y reglamentos que le corresponde poner en vigor, cede si la agencia: "(1) erró al aplicar la ley; (2) actuó arbitraria, irrazonable o ilegalmente, o (3) lesionó derechos constitucionales fundamentales". *Torres Rivera v. Policía de PR*, supra, págs. 627-628; *OEG v. Martínez Giraud*, supra. Finalmente, nuestra más Alta Curia ha expresado que, conforme a lo anterior, el criterio administrativo no podrá prevalecer en aquellas instancias donde la interpretación estatutaria realizada por una agencia provoque un resultado incompatible o contrario al propósito para el cual fue aprobada la legislación y la política pública que promueve. Así, "la deferencia judicial al *expertise* administrativo, concedido cuando las agencias interpretan la ley, tiene que ceder ante actuaciones que resulten irrazonables, ilegales o que conduzcan a la comisión de una injusticia". *OEG v. Martínez Giraud*, supra, pág. 11.

**B**

El Departamento de Asuntos del Consumidor (DACO) constituye el organismo administrativo cuyo principal propósito es defender, vindicar e implantar los derechos de las personas consumidoras en nuestra jurisdicción, mediante la aplicación de las leyes que asistan sus reclamos. Art. 3 de la Ley Orgánica del Departamento de Asuntos del Consumidor, Ley Núm. 5 de 23 de abril de 1973, según enmendada, 3 LPRA sec. 341b; *Polanco v. Cacique Motors,* 165 DPR 156 (2005). A tenor con ello, la agencia está plenamente facultada para resolver las quejas y querellas promovidas por las personas ciudadanas en ocasión a que se transgredan las disposiciones legales que proveen para la protección de sus prerrogativas; ello, en cuanto a servicios adquiridos o recibidos del sector privado de la economía. A su vez, el DACO está facultado para conceder los remedios pertinentes mediante la debida adjudicación administrativa. 3 LPRA secs. 341h, 341i-1.

En virtud de lo anterior, mediante la aprobación del Reglamento de Procedimientos Adjudicativos del DACO, Reglamento Núm. 8034 de 14 de junio de 2011 (Reglamento Núm. 8034), el organismo adoptó un esquema uniforme de reglas para la dilucidación de las controversias sometidas a su consideración. De este modo, la agencia ve regido el ejercicio de sus poderes respecto al proceso adjudicativo de que trate, por la aplicación de normas afines a la solución justa, rápida y económica de las querellas. Regla 1 del Reglamento Núm. 8034, *supra.* Las reglas contenidas en el referido precepto aplicarán a las investigaciones y los procedimientos administrativos sobre querellas iniciadas por consumidores o por el DACO. Regla 3 del Reglamento Núm. 8034, *supra.* Toda resolución emitida por esta agencia otorgará el remedio que en derecho proceda, aun cuando la parte querellante no lo haya solicitado. Regla 27.1 del Reglamento Núm. 8034, *supra.* Ahora bien, en la ejecución de sus facultades adjudicativas, la Regla 24 del Reglamento Núm. 8034, *supra*, expresamente adopta el principio administrativo sobre la aplicación subsidiaria de las reglas

procesales y probatorias propias de los trámites judiciales, al disponer como sigue:

> Las Reglas de Procedimiento Civil y de Evidencia no serán de estricta aplicación a las vistas administrativas, sino en la medida en que el Funcionario o Panel de Jueces que presida la vista o el Departamento estime necesario para llevar a cabo a los fines de la justicia.

Por otra parte, el Reglamento Núm. 8034, *supra*, esboza las condiciones en las que se llevará a cabo la celebración de una vista administrativa. Atinente a lo que nos ocupa, específicamente estatuye el derecho de las partes de presentar todo tipo de evidencia documental, testifical técnica o pericial en apoyo a sus respectivas teorías. Regla 20.5 del Reglamento Núm. 8034, *supra.*

**C**

El Reglamento Contra Prácticas y Anuncios Engañosos, Reglamento Núm. 8599 de 28 de mayo de 2015 (Reglamento Núm. 8599), se creó con el propósito de proteger a las personas consumidoras de las prácticas y anuncios que creen o tiendan a crear una apariencia falsa o engañosa sobre bienes o servicios ofrecidos en el comercio. Regla 2 del Reglamento Núm. 8599, *supra.* Igualmente, prohíbe las prácticas y anuncios engañosos con el fin de establecer un clima de confianza y respeto entre las entidades comerciantes, así como las personas consumidoras. *Íd.* Según el referido Reglamento, un anuncio engañoso es cualquier anuncio que constituya o tienda a constituir fraude, engaño o comunique o tienda a comunicar una idea falsa, confusa o incorrecta, sobre el bien o servicio anunciado y/o cualquier anuncio que omite datos relevantes del producto, bien o servicio, limitando o privando a la persona consumidora de tomar decisiones informadas y conscientes. Regla 5 (C) del Reglamento Núm. 8599, *supra.* En particular, la Regla 7 (B) del Reglamento Núm. 8599, *supra*, dispone que las prácticas y anuncios engañosos quedan prohibidos y que, entre otras cosas, constituye una práctica engañosa lo siguiente:

> 1. Representar o expresar un hecho o una oferta si tal declaración es engañosa o falsa, o posee la tendencia o

capacidad para confundir, o si no se tiene la información suficiente para sustentarla, o se ocultare un dato relevante. Incluye, a su vez, anunciar un bien o servicio para la venta y no tenerlo disponible o no tener las cantidades anunciadas.

2. Inducir o tratar de inducir a una persona a actuar a cambio de cualquier beneficio que luego resulta ser menor, falso, inexistente, ilícito o ilegal.

[…]

18. Las cláusulas que establezcan que el silencio del consumidor se tendrá por aceptación de cualquier oferta, modificación, restricción, ampliación, condición o prórroga de lo pactado en el contrato. El consentimiento del consumidor tiene que ser expreso y constar afirmativamente al aceptar una oferta.

[…]

20. La omisión del comerciante en entregar o prestar diligentemente el bien o servicio según anunciado u ofrecido.

[…]

Del mismo modo, la Regla 7 (C) del Reglamento Núm. 8599, *supra*, establece que el DACO podrá emitir interpretaciones oficiales de hechos, actos o situaciones que, a la luz del citado cuerpo reglamentario, constituyen prácticas o anuncios engañosos.

**D**

El contrato como fuente de la obligación "existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio". Art. 1206 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 3371 (derogado);[7] *Aponte Valentín et al. v. Pfizer Pharm*, 208 DPR 263, 284 (2021). Cónsono con tal obligación, el Artículo 1252 del Código Civil de Puerto Rico de 1930, 32 LPRA sec. 3511 (derogado), establece que los contratos en los que concurran los requisitos de consentimiento, objeto y causa pueden anularse, aunque no haya lesión para las personas contratantes, siempre que adolezcan de alguno de los vicios que los invalidan conforme a la ley.

---

[7] El derecho aplicable en el caso de autos se remite al Código Civil de Puerto Rico de 1930, 31 LPRA sec. 1 *et seq.* (derogado), toda vez que nos encontramos ante hechos ocurridos con anterioridad a la aprobación y vigencia del Código Civil de Puerto Rico de 2020, Ley Núm. 55-2020, 31 LPRA sec. 5311 *et seq.*

Según el Artículo 1217 del citado estatuto, el consentimiento es nulo cuando se prestó por error, violencia, intimidación o dolo. 31 LPRA sec. 3404 (derogado). De mediar alguna de estas circunstancias, la persona afectada cuenta con una acción para solicitar la nulidad del contrato que puede ejercitar en un periodo de cuatro (4) años a partir de la consumación del negocio o desde que cesó la violencia o intimidación en su contra. Art. 1253 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 3512 (derogado). El dolo se produce cuando una de las personas contratantes utiliza palabras o maquinaciones insidiosas para inducir a la otra parte a firmar un contrato que de otro modo no lo hubiese hecho. El dolo también significa callar sobre una circunstancia importante relacionada con el objeto del contrato.

No obstante, no todo dolo produce la nulidad del contrato. El Artículo 1222 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 3409 (derogado), establece que el dolo que produce la nulidad tiene que ser grave y no puede haber sido empleado por las dos partes contratantes. El dolo grave también es conocido como el dolo causante. Por el contrario, el dolo incidental no produce la nulidad del contrato, porque no tiene una influencia decisiva en la esencia de la obligación y solo facilita su celebración. A diferencia del dolo causante, en el dolo incidental existe la voluntad de contratar de la persona perjudicada, pero hay engaño en el modo cómo celebra el contrato. En tal escenario, el contrato de todas formas se hubiese celebrado, pero no en las mismas condiciones. En consecuencia, el dolo incidental solo obliga a indemnizar en daños y perjuicios. *García Reyes v. Cruz Auto Corp.,* 173 DPR 870, 886-887 (2008).

El dolo que anula el consentimiento se determina considerando, entre otras cosas, la preparación académica de la parte perjudicada, su condición social y económica, así como las relaciones y el tipo de negocios en que se ocupa. *García Reyes v. Cruz Auto Corp.,* supra, pág. 887. Al igual que el fraude, el dolo no se presume. No obstante, no tiene que probarse directamente, ya que puede establecerse mediante inferencia o

evidencia circunstancial. Una vez decretada la nulidad de una obligación, las partes contratantes deben restituirse recíprocamente las cosas que hubiese sido materia del contrato con sus frutos y el precio con sus intereses. *Íd.*, págs. 887-888.

Cónsono con lo anterior, el Artículo 1373 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 3841 (derogado), dispone lo siguiente:

> El vendedor estará obligado al saneamiento por los defectos ocultos que tuviere la cosa vendida, si la hacen impropia para el uso a que se le destina o si disminuyen de tal modo este uso que, de haberlos conocido el comprador, no la habría adquirido o habría dado menos precio por ella; pero no será responsable de los defectos manifiestos o que estuvieren a la vista, ni tampoco de los que no lo estén, si el comprador es un perito que, por razón de su oficio o profesión, debía fácilmente conocerlos.

Por su parte, el Artículo 1374 del referido estatuto establece lo siguiente:

> El vendedor responde al comprador del saneamiento por los vicios o defectos ocultos en la cosa vendida, aunque los ignorase.
>
> Esta disposición no regirá cuando se haya estipulado lo contrario, y el vendedor ignorara los vicios y defectos ocultos de lo vendido. 31 LPRA sec. 3842 (derogado).

La parte compradora podrá optar entre desistir del contrato, abonándosele los gastos que pagó (acción redhibitoria), o podrá rebajar una cantidad proporcional del precio (acción *quinta minoris*). Además, si la parte vendedora conocía los vicios o defectos ocultos de la cosa vendida y no lo manifestó a la compradora, se le indemnizará de los daños y perjuicios, en caso de que opte por la rescisión. Art. 1375 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 3843 (derogado). En particular, la acción de saneamiento por vicios ocultos requiere el cumplimiento de los siguientes requisitos: (1) los vicios no deben ser conocidos por la persona adquiriente; (2) el defecto debe ser grave o suficientemente importante para hacer la cosa impropia para el uso destinado o que disminuya de tal modo su uso, que, de la parte compradora haberlo sabido, no la hubiese comprado o habría dado menos precio; (3) el vicio tiene que ser preexistente a la venta; y (4) que se ejercite la acción en el plazo de seis

meses desde la entrega de la cosa vendida, de acuerdo al Artículo 1379 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 3847 (derogado). *García Reyes v. Cruz Auto Corp.,* supra, págs. 890-891.

**E**

Sabido es que este Tribunal Apelativo actúa, esencialmente, como foro revisor. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013). Es por ello que, nuestra encomienda principal es examinar cómo los foros inferiores aplican el Derecho a los hechos particulares de cada caso. *Íd.* Cónsono con lo anterior, el desempeño de nuestra función revisora se fundamenta en que el foro de origen desarrolle un expediente completo que incluya los hechos que haya determinado ciertos a partir de la prueba que se le presentó. *Íd.* Es decir, nuestra función de aplicar y pautar el Derecho requiere saber cuáles son los hechos, tarea que corresponde, primeramente, al foro juzgador. *Íd.* Como foro apelativo, no celebramos juicios plenarios, no presenciamos el testimonio oral de los testigos, no dirimimos credibilidad y no hacemos determinaciones de hechos. *Íd.* Esa es la función del foro juzgador. *Íd.*

Por el contrario, al momento de analizar prueba documental, prueba pericial o testimonios de testigos ofrecidos mediante declaraciones escritas, estamos en la misma posición que el foro recurrido. *Ortiz et al. v. S.L.G. Meaux*, 156 DPR 488, 495 (2002). Así, "el Tribunal Apelativo tendrá la facultad para adoptar su propio criterio en la apreciación y evaluación de la prueba pericial, y hasta para descartarla, aunque resulte técnicamente correcta". *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021), citando a *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011). Asimismo, es norma básica que las conclusiones de derecho son revisables en su totalidad por el foro apelativo. *Dávila Nieves v. Meléndez Marín*, supra, pág. 770. Ahora bien, como norma general, los tribunales apelativos aceptan como correctas las determinaciones de hechos de los foros inferiores, así como su apreciación sobre la credibilidad de los

testigos y el valor probatorio de la prueba presentada en la sala. *Íd.*, pág. 771.

En consideración a la norma de corrección que cobija a las determinaciones realizadas por el foro de origen, cuando una parte peticionaria señala errores dirigidos a cuestionar la apreciación o suficiencia de la prueba, la naturaleza del derecho apelativo requiere que esta ubique al foro revisor en tiempo y espacio de lo ocurrido en el foro recurrido. Ello se logra utilizando alguno de los mecanismos de recopilación de prueba oral, como lo son: (1) transcripción de la prueba, (2) exposición estipulada o (3) exposición narrativa. *Pueblo v. Pérez Delgado*, 2023 TSPR 35, 211 DPR __ (2023). Los tribunales de mayor jerarquía no pueden cumplir a cabalidad su función revisora sin que se le produzca, mediante alguno de estos mecanismos, la prueba que tuvo ante sí el foro inferior. *Íd.*

En lo atinente al caso de autos, en recursos de revisión judicial, la transcripción de la vista administrativa o una exposición narrativa de la prueba son imprescindibles cuando se cuestiona la apreciación de la prueba y la adjudicación de credibilidad del foro administrativo. Los tribunales revisores no deben intervenir con la apreciación de la prueba oral de las agencias, si no tienen forma de evaluar la evidencia presentada, debido a que no se elevó una transcripción o una exposición narrativa de la prueba. El Tribunal Supremo de Puerto Rico ha reconocido que, en ausencia de la prueba oral, difícilmente se podrá descartar la determinación impugnada. Por lo tanto, la parte interesada tiene que presentar la prueba oral bajo la que se pretende impugnar las determinaciones de una agencia administrativa. En particular, la Regla 66 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 66, establece el trámite a seguir para que se autorice la reproducción de la prueba oral desfilada en el procedimiento administrativo. De otro lado, la Regla 29.5 del Reglamento Núm. 8034, *supra*, dispone que cualquier parte podrá solicitar copia certificada del expediente y de la transcripción de la vista, mediante el pago

de los cargos correspondientes. *Graciani Rodríguez v. Garage Isla Verde,* supra, págs. 128-130.

Esbozada la norma jurídica, procedemos a aplicarla al recurso ante nos.

**III**

En la presente causa, la parte recurrente argumenta que el DACO erró al declarar con lugar la querella promovida por los recurridos, bajo actos prohibidos en el Reglamento Núm. 8599, *supra*. De igual modo, aduce que el organismo incidió al resolver que el contrato suscrito entre las partes era nulo por dolo. Sostiene, además, que la agencia erró al conceder una indemnización de $25,000.00 a cada recurrido por concepto de daños y angustias mentales, ordenar a resarcir a los recurridos $5,000.00 por concepto de mensualidades pagadas por equipos comprados y la imposición de $15,000.00 por honorarios de abogado. Habiendo examinado los referidos señalamientos a la luz del derecho aplicable y la prueba, confirmamos la resolución administrativa recurrida. Nos explicamos.

En esencia, la parte recurrente cuestiona la credibilidad de la prueba que llevó al DACO a concluir que el contrato en cuestión es nulo y que había violentado lo estatuido en el Reglamento Núm. 8599, *supra*. No obstante, no presentó ante esta Curia una transcripción de la prueba oral, ni una exposición narrativa a esos efectos. Sin la prueba oral no podemos descartar las determinaciones de la agencia impugnadas. Por otro lado, Máximo Solar no ha probado que en el expediente de la agencia existe evidencia sustancial que derrote el valor probatorio de la prueba creída por el foro administrativo, cuya copia certificada tenemos ante nos. La falta de esa evidencia nos imposibilita para descartar la apreciación de la prueba del DACO en el presente caso.

Un examen sosegado del expediente que nos ocupa mueve nuestro criterio a resolver que no se hacen presentes los criterios legales que legitiman nuestra intervención respecto a lo dispuesto por el organismo administrativo concernido. A nuestro juicio, la determinación aquí

impugnada obedeció a un ejercicio razonable de apreciación de prueba por parte de la entidad recurrida, a la adecuada función de las facultades legales que le asisten, así como también, a una correcta interpretación y aplicación del derecho pertinente. En particular, la *Resolución* recurrida está basada en evidencia sustancial que no fue controvertida por la parte recurrente. En el caso de autos, la agencia dio credibilidad al testimonio de los recurridos de que fueron engañados por Máximo Solar en la presentación de las placas solares (sistema fotovoltaico), además de no ser debidamente orientados por este.

En mérito de lo antes expuesto, sostenemos la determinación agencial recurrida. Nada en el expediente de autos sugiere que el pronunciamiento que atendemos haya resultado de un ejercicio arbitrario atribuible al DACO. Por tanto, en ausencia de prueba al contrario, solo podemos sostener su determinación.

**IV**

Por los fundamentos que anteceden, confirmamos la *Resolución* administrativa recurrida.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones